In the
**UNITED STATES DISTRICT COURT**
for the **SOUTHERN DISTRICT OF INDIANA**,
INDIANAPOLIS DIVISION

| | |
|---|---|
| **GLEN C. SCOTT**, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| *vs.* | ) CAUSE NO. 1:08-cv-150-SEB-DKL |
| | ) |
| **CITY OF INDIANAPOLIS** and **JAMES L. GREESON**, individually and in his official capacity as Fire Chief, | ) ) ) |
| | ) |
| Defendants. | ) |

# E N T R Y

**Defendants' Motion for Summary Judgment (doc. 33)**

The plaintiffs, twenty Caucasian firefighters employed by the City of Indianapolis's Fire Department, allege that they were passed over for promotion because of their race. They brought this suit against the City of Indianapolis and James L. Greeson, the Fire Chief at the time,[1] claiming that these defendants' discriminatory promotions violated their statutory rights under Title VII, § 703(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and their

---

[1] According to their caption, the plaintiffs sue Mr. Greeson "Individually and in his Official Capacity as Fire Chief." Because "an official capacity suit is another way of pleading an action against an entity of which the officer is an agent," *Sow v. Fortville Police Dept.*, 636 F.3d 293, 300 (7th Cir. 2011), and the City of Indianapolis is already a defendant, suing Mr. Greeson in his official capacity is redundant. In addition, because Mr. Greeson apparently left office sometime in May 2008, after this suit was filed, he no longer has an official capacity and the current Chief was automatically substituted for him on the redundant official-capacity claim. Fed. R. Civ. P. 25(d). "Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any time, but the absence of such an order does not affect the substitution." *Id.* We construe the defendants to be the City of Indianapolis and James L. Greeson, in his individual capacity.

constitutional rights under the equal-protection clause of the Fourteenth Amendment to the United States Constitution. The defendants move for summary judgment on all claims. For the reasons contained herein, their motion is denied.

The process for merit promotions in the Indianapolis Fire Department are controlled by state statutes and city ordinances. See Ind. Code 36-8-3.5, *et seq.*; Indpls. Muni. Code § 252-2-6, *et seq*. The process begins by the Fire Department administering written tests, oral interviews, and assessment-center exercises to each eligible firefighter. Each firefighter's test results are compiled into a single score and the names and other data of the candidates are included in rank order on an eligibility list that is given to the Fire Chief. The Fire Chief then recommends candidates for promotion to the Fire Merit Board which must approve all promotions.

In December 2006, the Fire Chief was presented with two lists for promotions: 140 candidates for promotion from private to lieutenant (the "lieutenants list") and 80 candidates for promotion from lieutenant to captain (the "captains list"). On the lieutenants list, the first (highest ranked) twenty-two firefighters and two lower-ranked firefighters (nos. 27 and 29) already had been promoted or otherwise were unavailable for promotion at that time.[2] The Fire Chief selected, and the Merit Board approved, the promotion of 20 privates to lieutenant, five of whom were African-Americans. The Fire Chief selected the first 16 available candidates in rank order (nos. 23-26, 28, and 30-40), then he skipped down the list to select four more: Eric Fouce

---

[2] Apparently, the ranked eligibility lists were used for multiple promotion classes over a period of time. The lieutenants list used for the December 2006 promotions is titled "Post Appeal Final — 2004 Lieutenant." The captains list is titled "2004 IFD CPT Promotion Final Results."

at position 44, William Head at 47, Aleatha Quarles at 60, and Tony Boyce at position 77. The four candidates who were selected out-of-order are African-Americans. The plaintiffs in this case include 16 Caucasian firefighters who allege that they were skipped over for promotion to lieutenant in favor of these four candidates promoted out of rank order.

The Fire Chief and the Fire Merit Board promoted 32 firefighters from lieutenant to captain. The Fire Chief selected the first 31 firefighters listed in rank order and then skipped the next fourteen names to selected Arthur Borel, ranked no. 46, who is African-American. Of the 32 firefighters promoted, 6 were African-American. The plaintiffs include 4 Caucasian firefighters who allege they were skipped over in favor of Mr. Borel.

The plaintiffs claim that "the individual Defendant formulated and the Defendant City maintains, a policy or practice [of] racial discrimination against whites in favor of black officers in promotions to Lieutenant and Captain," Complaint (doc. 1) ¶ 31, and that they have been damaged "through the loss of pay, reputation, professional opportunities and experience, collegiality with fellow officers, and consortium with family members, and have suffered stress and emotional distress," *id*. ¶ 32. The plaintiffs seek all available relief including back pay, front pay, compensatory damages, punitive damages, injunctive relief including cessation of the unlawful practices, and attorney's fees. *Id*. ¶ 33.

## Standards

A plaintiff has two avenues of proof available to defeat a defendant's motion for summary judgment and get to trial: the direct and the indirect method. *Rodgers v. White*, ___ F.3d ___, 2011 WL 4349464, *5 (7th Cir., Sept. 2, 2011) (*McDonnell Douglas* burden-shifting

3

scheme "applies equally to discrimination claims under Title VII, § 1981, and § 1983"); *Radentz v. Marion County*, 640 F.3d 754, 756-57 (7th Cir. 2011) (same,§ 1983 equal-protection claim); *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005) (burden-shifting scheme applies in Title VII reverse-discrimination claims). Under the direct method of proof, a plaintiff presents direct and/or circumstantial evidence of discrimination to "demonstrate 'triable issues as to whether discrimination motivated the adverse employment action.'" *Darchak v. City of Chicago Board of Education*, 580 F.3d 622, 631 (7th Cir. 2009). Direct evidence of discrimination is basically an admission by a defendant that it "was motivated by discriminatory animus" and it is rare to have it. *Id*. Circumstantial evidence is a more attenuated route that "suggests discrimination albeit through a longer chain of inferences." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641 (7th Cir. 2008) (internal quotation marks omitted). Circumstantial evidence typically consists of three types:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Id*. (quoting *Sun v. Board of Trustees of the University of Illinois*, 473 F.3d 799, 812 (7th Cir.), *cert. denied*, 551 U.S. 1114 (2007)). If a plaintiff's direct and/or circumstantial evidence is sufficient to raise the question of intent, the case goes to the jury. *Id*. at 632-33 ("as a question of intent, it is properly put to the jury, not to the court on summary judgment. . . . Employment discrimination cases often center on parties' intent and credibility, which must go to a jury unless 'no rational factfinder could draw the contrary inference'").

The indirect method of proving discrimination is a judicially created protocol that utilizes "a certain subset of circumstantial evidence" to create an inference of discrimination. *Faas*, 532 F.3d at 641. This protocol, established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is a staged burden shifting process between the plaintiff and the defendant. First, the plaintiff must present evidence establishing a *prima facie* case of discrimination. If the plaintiff succeeds, then the burden shifts to the defendant to present proof that it took the alleged adverse employment action for a legitimate, non-discriminatory reason. If the defendant succeeds, then the burden shifts back to the plaintiff to prove that the defendant's proffered reason is pretextual, meaning that it is a lie. *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009), *cert. denied*, 130 S.Ct. 2101 (2010).

> In order to show that the employer's stated, nondiscriminatory reason for firing him is pretextual, the plaintiff must present evidence suggesting that the employer is dissembling. Where, as here, the employer contends that the plaintiff's job performance was wanting, the plaintiff must do more than dispute the validity of the employer's criticisms. The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge. "[I]t is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie."

*O'Leary v. Accretive Health, Inc.*, ___ F.3d ___, 2011 WL 4375684, *8 (7th Cir, Sept. 21, 2011). The ultimate burden of persuasion remains on the plaintiff to prove that the defendant intentionally discriminated against him for an impermissible reason. *Id*.

To state a *prima facie* case of employment discrimination under Title VII, a plaintiff must prove that "(1) he is a member of a protected class; (2) his job performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated

5

persons outside the class received more favorable treatment." *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 709 (7th Cir. 2011). The first element of the *prima facie* case is often rephrased for "reverse-discrimination" claims. In such a case, a plaintiff must present evidence proving:

> (1) " 'background circumstances' that demonstrate that a particular employer has 'reason or inclination to discriminate invidiously against whites' or evidence that 'there is something "fishy" about the facts at hand' "; (2) he was performing his job up to his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly-situated individuals who are not members of the protected class.

*Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007). This rephrasing of the first element is intended only to conform the "protected class" terminology of the original articulation of the standard in *McDonnell Douglas* to the nature of a "reverse discrimination" claim; there is no substantive change in the elements. *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 820-21 (7th Cir. 2006).

A plaintiff asserting a § 1983 claim that his municipal employer discriminated against him in violation of the equal-protection clause of the Fourteenth Amendment must prove additional elements for his *prima facie* case. First, he must show that the defendant acted under color of state law. *Sims v. Mulcahy*, 902 F.2d 524, 539 n. 8 (7th Cir.), *cert. denied*, 498 U.S. 897 (1990). Second, in order to hold the municipality liable, he must show that the deprivation of his equal-protection right was the result of a municipal policy, practice, or custom. *Id*. at 538. Third, the plaintiff must show that the defendant employer acted with discriminatory intent. *Id*. at 538-39; *McPhaul v. Board of Commissioners of Madison County*, 226 F.3d 558, 564 (7th Cir. 2000). The last element distinguishes a § 1983 equal-protection claim from a Title VII claim:

> "Under Title VII, the petitioner must prove that she was discriminated against through disparate treatment based on an

> impermissible factor, or disparate impact of a neutral practice on a
> protected group.  In an Equal Protection claim, the petitioner faces
> the tougher standard of proving purposeful and intentional acts of
> discrimination based on her membership in a particular class not
> just on an individual basis."

> Thus, for Sims to demonstrate a *prima facie* case of racial discrimination under
> the equal protection clause, she must not only establish that she was treated
> differently, but she must also establish that the "*defendants acted with
> discriminatory intent*."  The requirement of a demonstration of intent based upon
> "membership in a particular class" described in *Forrester* is more than a decision
> maker's simple awareness of the consequences of his or her actions.  As the
> Supreme Court stated in *Personnel Administrator of Massachusetts v. Feeney*,
> 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979):
>
>> " 'Discriminatory Purpose,' . . . implies more than intent as
>> volition or intent as awareness of consequences.  It implies that the
>> decision maker, in this case a state legislature, selected or
>> reaffirmed a particular course of action at least in part 'because,'
>> not merely 'in spite of' its adverse affects upon an identifiable
>> group."

*Sims*, 902 F.2d at 538-39 (citations omitted).  There is no dispute in the present case that the City of Indianapolis, through its Fire Department and its Fire Chief, acted under color of state law and pursuant to official policy or decisionmaking.

A plaintiff who has proven a discriminatory motive by the direct method on a Title VII claim will survive summary judgment even if the defendant presents unrebutted proof of non-discriminatory reasons for its actions because such reasons alone do not defeat the plaintiff's claim.  Even if a jury credits the defendant's proof of legitimate reasons at trial, it might find that a discriminatory motive also played some role in the defendant's decision to take the adverse employment action.  *Darchak*, 580 F.3d at 633.  Title VII provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even

7

though other factors also motivated the practice." 42 U.S.C. 2000e-2-(m). A protected factor is "a motivating factor" if it played a part or a role in the defendant's decision, *Boyd v. Illinois State Police*, 384 F.3d 888, 895 (7th Cir. 2004), either as a sufficient or necessary condition, *see id*. at 899-900 (Posner, J., concurring).[3] However, if a plaintiff proves a mixed-motive violation under § 2000e-2(m) but the defendant "demonstrates that [he] would have taken the same action in the absence of the impermissible motivating factor, the court . . . may grant declaratory relief, injunctive relief . . . , and attorney's fees and costs . . . and shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment . . . ." 42 U.S.C. § 2000e-5(g)(2)(B). Thus, if the defendant proves that it had a sufficient non-discriminatory reason for its adverse employment action against the plaintiff, it obtains a partial affirmative defense against, or immunity from, much of the available relief.

Because Title VII mixed-motive cases raise traditional jury issues of intent and motivation, as well as issues of degree of motivation (sufficient, necessary), "[s]ummary judgment will rarely be granted in a mixed motive case once the plaintiff has presented direct (including circumstantial) evidence that a forbidden factor contributed to the employer's decision to take an adverse action against the employee." *Amrhein v. Health Care Service Corp.*, 546 F.3d 854, 862 (7th Cir. 2008).

---

[3] A reason is a sufficient condition or cause of an adverse employment action if the defendant would have taken the action based on that reason alone (other sufficient reasons might be present as well). A reason is a necessary, but not a sufficient, condition or cause if the defendant would not have taken the action for any of the existing reasons alone, but also would not have taken the action if any of the reasons were absent. In other words, it was the combination of the reasons that caused the defendant to take the adverse employment action, and each reason was a necessary cause and each was an insufficient cause. *Boyd*, 384 F.3d at 899-900.

Mixed motives are treated differently in equal-protection claims under § 1983. Because the 1991 amendments to the Civil Rights Act, which added §§ 2000e-2(m) and 2000e-5(g)(2)(B) to Title VII, did not alter the extant mixed-motive law under § 1983, the rule of *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), still governs. Thus, a defendant in a § 1983 employment-discrimination suit who proves, by a preponderance of the evidence, that it would have taken the alleged adverse employment action for legitimate, non-discriminatory reasons regardless of the presence of a concurrent discriminatory motivation avoids liability entirely. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 2001); *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2nd Cir. 1999).

## Discussion

**Consent decree.** In 1978, the United States sued the City of Indianapolis to remedy race and gender discrimination in its police and fire departments. *United States v. City of Indianapolis, et al.*, Cause no. IP 78-388-C. The suit was quickly resolved by two consent decrees and an addendum. The first decree addressed race discrimination in the fire and police departments.[4] Much of the parties' arguments in the original briefing on the present motion were based on their divergent interpretations of the terms of that first consent decree which was in effect during the December 2006 promotions at issue in this case and until it was dissolved by the Court in August 2008. The defendants argued that their actions were required by the terms

---

[4] The first decree, issued on July 19, 1978 (doc. 34-1), addressed discrimination on the basis of race and color. The second decree, issued on January 9, 1979 (doc. 34-2), addressed gender discrimination. The three-page addendum, issued on May 20, 1981 (doc. 34-3), addressed goals and procedures for attracting and hiring female firefighters in entry-level positions.

9

of the consent decree, which they were bound to obey until it was formally dissolved. They contend that the decree mandated that the Fire Department achieve prescribed racial goals or quotas in promotions and that obedience to that mandate constitutes a non-discriminatory reason for passing over some Caucasian firefighters in favor of promoting African-American candidates and entitles Mr. Greeson to quasi-judicial and qualified immunity for his actions in implementing the consent decree through his racially motivated promotion decisions.

After the initial briefing closed on the present motion, the United States Court of Appeals for the Seventh Circuit issued its decision in *Finch v. Peterson*, 622 F.3d 725 (7th Cir. 2010), a case similar to this one in which Caucasian Indianapolis police officers sued the City for reverse discrimination, alleging that they had been passed over for promotions because of their race in favor of promotions of African-Americans. The defendant city and officials in *Finch*, as do the defendants here, relied on the terms of the 1978 same consent decree as a legitimate, non-discriminatory reason for their promotions decisions and as a ground for qualified immunity. The Seventh Circuit rejected their arguments, holding that "the consent decree is quite clear that race shall have no place in the promotions process," *Finch*, 622 F.3d at 729, and that the decree's terms constitute an "explicit prohibition against using race in making promotion decisions," *id*. at 730.

In support of their original briefing, the defendants had submitted an affidavit by Mr. Greeson declaring that, under his tenure as Chief, the Fire Department's policy was that at least 25% of each promotions class would be African-Americans in order to comply with the terms of

the consent decree. Greeson Affidavit (doc. 34-5) ¶ 15.[5] While he gave race-neutral reasons for selecting Quarles and Boyce, Mr. Greeson expressly averred that he selected the other two African-American candidates who were selected out of rank order, Fouce and Head, only because of their race in order to comply with the terms of the consent decree. *Id.* ¶ 28. The defendants also argue on the present motion that compliance with the consent decree was their non-discriminatory reason for skipping higher-ranked Caucasian candidates in order to promote Fouce and Head. (Defendants' Memorandum in Support of Their Motion for Summary Judgment (doc. 35) ("Brief") at 10.) In their original briefing, the defendants had also based their argument for absolute quasi-judicial immunity for Mr. Greeson (in his individual capacity) on the asserted fact that "when Chief Greeson acted to carry out the Consent Decree's express terms, he acted pursuant to an enforceable court order." (Brief at 25).

Following the *Finch* decision, this Court directed the parties to submit supplemental briefs addressing the effect of that decision on this case. Their submissions are discussed below.

**Lieutenants promotions.** After essentially conceding that they could no longer rely on

---

[5] Mr. Greeson mistook not only whether the consent decree mandated that race be considered in making promotions, but also the actual goals or standards that the consent decree established. The 25% goal was only for admissions to future training classes, not promotions. § IV. A. 2. "As a long-term goal," the defendants agreed to adopt and seek to achieve a goal of "promoting blacks to the ranks of . . . Corporal, Chauffeur, Lieutenant and Captain within the Fire Department so as to attain a percentage within those ranks which is reasonably representative of the percentage in the ranks from which promotions are traditionally made, the black percentages of which will begin to increase under the provisions of this Decree relative to the recruitment and hiring of . . . firefighters [the 25% goal for admissions to training classes]." § IX. A. 1. Data submitted by the plaintiffs indicate that the Fire Department had achieved this representative goal for promotions about two years before the promotions in this case. In this same chapter, the decree provided that "[p]romotions shall be based upon relevant standards and criteria which will be applied without regard to race or color." *Id.* § IX. C. 1.

compliance with the consent decree as a legitimate nondiscriminatory reason for their discriminatory promotions after *Finch*, the defendants nonetheless argue that their reasonable, albeit mistaken, belief that the consent decree mandated their discriminatory promotions should qualify as a legitimate, nondiscriminatory reason for their decisions. They presented no authority for such a "good faith" exception to the anti-discrimination laws.[6] As did the *Finch* court, we find that the terms of the consent decree are "quite clear," *Finch*, 622 F.3d at 729, "unmistakable," *id*., and "explicit", *id*. at 730, that using race as a consideration in making promotions decisions was prohibited. No matter how "widespread" or "historic" the defendants' mistaken interpretation of the decree was, (Defendants' Supplemental Memorandum (doc. 72) at 4), it was unreasonable. The Fire Chief and the Merit Board would have been better served had they consulted and complied with the actual terms of the consent decree rather than any common assumptions or descriptions about what they meant. The defendants' mistaken belief does not constitute a legitimate race-neutral excuse for their discriminations.

Chief Greeson averred that his and the Fire Department's policy, which they believed was mandated by the consent decree, was to promote 25% African-Americans in each promotion class. Chief Greeson achieved that goal in the December 2006 lieutenants class: 5 of the 20 total promotions to lieutenant were African-Americans, exactly 25%. He selected the top 16

---

[6] The defendants instead rely on decisions holding that parties must comply with the terms of consent decrees, no matter how much they might disagree with them, until the decrees are modified or dissolved. Because the consent decree in this case clearly did not mandate the actions that the defendants took, those decisions are inapposite. Moreover, we note again, that even had the terms of the consent decree allowed race to be taken in consideration when making promotion decisions, the goals set forth therein already had been achieved and would not have mandated or justified the defendants' discriminatory decisions.

candidates in rank order, consisting of 15 Caucasians and 1 African-American, or 6.25% African-Americans promoted. He went out of order to select the next two highest-ranking African-Americans, Fouse (44 on list) and Head (47), passing over 5 candidates, all of whom are Caucasian and plaintiffs here: Bucci (41), Scott (42), Schneidt (43), Whitaker (45), and Travis (46). These selections of Fouse and Head produced a 16.67% representation rate of African-Americans.

     Mr. Greeson averred that he selected the final two candidates, Quarles (60) and Boyce (77), both African-American, for non-discriminatory reasons. Between Head (47) and Quarles (60), there were 11 Caucasians (6 of whom are plaintiffs) and 1 African American. Between Quarles (60) and Boyce (77), there were 11 Caucasians (5 of whom are plaintiffs), 1 Hispanic, and 4 African-Americans. Regarding these last two promotions, the Court cannot say that Chief Greeson "skipped" the intervening candidates or that he selected one candidate "next" or "before" another candidate because there is no evidence of the order in which he made his selections. The plaintiffs do not question Chief Greeson's selection of the top-ranked 16 candidates on the lieutenant's list. (Presumably, they would have been satisfied, or at least would not have brought this suit, had Chief Greeson simply selected the 20 top-ranked candidates for promotion.) If the defendants' asserted race-neutral reasons for selecting Quarles and Boyce are unrebutted, then only two slots remained to be filled, whether they were filled first, in the middle, or at the end. If the defendants' race-neutral reasons for promoting Quarles and Boyce are credited, then it appears that, after selecting the top-ranked 16 candidates and selecting Quarles and Boyce, Chief Greeson selected the two highest ranking African-Americans, Fouce and Head, in order to reach his assumed racial quota or goal for this

13

lieutenants class.

In this scenario, and absent any other evidence or assertion regarding the likelihood of promotion of individual candidates, the only candidates that Chief Greeson actually "skipped" in order to select Fouce and Head were plaintiffs Bucci and Scott, the top two ranked candidates after the original 16 promotions.  If we found on the present motion, or the jury found at trial, that the defendants did not have a non-discriminatory reason for selecting Quarles and Boyce, then plaintiff Schneidt, the third highest ranked candidate after the 16 rank-order selections, also would have been skipped because Fouce is the next highest ranked candidate.  None of the other candidates were skipped when defendants made their promotion decisions.  The non-skipped plaintiffs nonetheless may continue as plaintiffs because the defendants or the plaintiffs, however remote, might be able to prove at trial some reason that Defendants would not have selected the "nexts-in-line" for promotions, but would have skipped to a lower-ranked candidate-plaintiff.  Each plaintiff will have to prove that he or she, individually, was damaged by the discriminatory promotions of Fouce, Head, Quarles, or Boyce, meaning that they likely would have been promoted in one of their steads.

Because it is undisputed that the defendants promoted candidates Fouce (44) and Head (47) because of their race, and the defendants advance no additional race-neutral reasons for their selection, the plaintiffs' Title VII and § 1983 claims are viable in relation to those two promotions.  In regard to the Quarles and Boyce promotions, the defendants attempt to show that they had non-discriminatory reasons for those out-of-rank-order promotions (to shift the burden back to plaintiffs) and they argued that, because African-American candidates were also skipped,

the plaintiffs could not prove that they were treated differently (attacking an element of their *prima facie* case).[7]  The plaintiffs responded with a showing that the defendants' asserted race-neutral reasons for promoting Quarles and Boyce were mere pretexts or not worthy of belief and that, given Chief Greeson's and the Fire Department's established policy of promoting 25% African-Americans in each promotions class, the defendants' skipping of African-Americans in order to appoint Fouce, Head, Quarles, and Boyce does not defeat the plaintiffs' showing of disparate treatment because no Caucasian would have benefitted from the defendants' skips; the defendants were skipping some African-Americans only to appoint other African-Americans. All of these arguments and showing are in the context of an indirect-method protocol, but they need not be addressed or decided.

Having filed their motion first, the defendants did not know, but assumed, that the plaintiffs would proceed by way of the *McDonnell Douglas* indirect method and they structured their arguments accordingly.  As it turned out, the plaintiffs' response meets the defendants' arguments point for point, in support of an indirect-method showing.  However, in their supplemental brief, the plaintiffs shift to a direct-method approach.  They contend that Mr. Greeson's admission that he and the Fire Department intentionally and systematically, as a matter of policy, discriminated on the basis of race

> taints every promotion of a black achieved by skipping a higher-ranked white officer.  It casts a doubt on the promotions of Quarles, [Boyce], and Borel even

---

[7] Without more evidence regarding whether the defendants would have deviated from the rank order if the four contested out-of-order promotions were not made, the only candidates technically "skipped" — meaning that they were next in line for promotion — were plaintiffs Bucci, Scott, and Schneidt.  Again, Fouce, one of the out-of-order racial promotions, was the fourth highest ranked candidate after the original 16 rank order promotions.

> though Greeson offered race-neutral justifications for their promotions, especially in light of the flimsiness of those justifications. Employment decisions often center on parties' intent and credibility, which must go to a jury unless no rational factfinder could draw the contrary inference. *Darchak v. City of Chicago*, 580 F.3d 622, 633 (7th Cir. 2009). Greeson's admission raises the inference that impermissible racial considerations informed each contested promotion. Thus *Finch* applies to all of the contested promotions and precludes summary judgment as to all of them.

(Plaintiff's [*sic*] Supplemental Brief (doc. 73) at 4-5). Mr. Greeson's admission sufficiently raises the inference that race was *a motivating factor* in all of the defendants' promotion decisions regarding both the lieutenant and the captain classes and that the question of the defendants' intent or the motivating factors for their decisions should be presented to a jury to decide. A reasonable jury could find a mixed motive in this case, *i.e.*, that race was a motivating factor in the defendants' selections along with, or in spite of, any concurrent race-neutral reasons for the defendants to promote Quarles, Boyce, and Borel.

If the jury finds a mixed motive, then, under the 1991 amendment to the Civil Rights Act, a violation of Title VII would be proven even if the defendants also proved by a preponderance of the evidence that they had concurrent non-discriminatory reasons for each promotion and would have promoted Quarles and Boyce regardless of a racial motivation. However, they would enjoy an immunity against many elements of relief, *e.g.*, damages, back pay, front pay. 42 U.S.C. 2000e-5(g)(2)(B). The result of a mixed-motive finding for the plaintiffs' § 1983 equal-protection claims would be different: under the rule of *Price Waterhouse*, the defendants would not be liable under § 1983 for an equal-protection violation. While all of the plaintiffs are asserting § 1983 equal-protection claims, only plaintiffs Scott and Whitaker have asserted Title VII claims.

**Captains list.**  The defendants promoted the top 31 candidates in rank order on the captains list and then skipped over the next 14 ranked candidates,[8] including 4 plaintiffs in this case, to promote candidate Borel, an African-American, who was ranked 46th.  Mr. Greeson asserts that he had a non-discriminatory reason for selecting Borel and the plaintiffs responded that his reason is unworthy of belief.  However, as discussed above, the plaintiffs have made a sufficient direct-method showing of discriminatory intent to survive summary judgment according to the direct-method of proof.  Race-neutral explanations and pretext arguments are irrelevant.  Because only Borel was selected out of rank order, and no other reasons are apparent for selecting any candidate, only the candidate ranked 32nd was technically "skipped" (on the present record) in favor of Borel.  However all four of the plaintiffs on the captains list may proceed to trial and attempt to prove that they were individually injured or damaged by the defendants' promotion of Borel.  Because none of the four plaintiffs on the captains list has asserted a Title VII claim, if the jury believes the defendants' proof that they had a non-discriminatory purpose for promoting Borel, then these four plaintiffs cannot prevail on their § 1983 claims.

**Absolute quasi-judicial immunity.**  The defendants argue that Mr. Greeson should enjoy absolute quasi-judicial immunity in his individual capacity from the plaintiffs' suit because, when he "acted to carry out the Consent Decree's express terms, he acted pursuant to an enforceable court order," and was "an integral part[] of the judicial process." (Brief at 25).  The *Finch* decision makes clear that Chief Greeson was not, in fact, carrying out the express terms of

---

[8] 13 of the skipped candidates are Caucasian; 1 is African-American.

the consent decree when he engaged in racially discriminatory promotions. In addition, he did not become an integral part of the judicial process, like a judge or a prosecutor, merely by being a party to a consent decree and obeying its provisions. He was not implementing an order or directive from the Court for the Court's own purposes or to facilitate a judicial proceedings. Mr. Greeson is not entitled to quasi-judicial immunity.

**Qualified immunity.** Qualified immunity protects government agents from suits for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th Cir. 2004). Mr. Greeson argues that whether the immunity protects him depends on "whether reasonable officials in Chief Greeson's position should have known in 2006 that making promotional decisions consistent with the dictates of the Consent Decrees and Addendum was unconstitutional." (Brief at 28). According to the clear terms of the consent decree, as recognized in *Finch*, Chief Greeson was not making promotional decisions consistent with the dictates of the consent decree; on the contrary, he was directly violating the decree's explicit dictates. It was also clearly established at the time that discriminating on the basis of race in promotions was unconstitutional unless the practice satisfied strict-scrutiny review. Mr. Greeson has not made any argument that his racially motivated promotion decisions could satisfy strict scrutiny review, that a reasonable person in his position should not have known in 2006 that racial discrimination in promotions was unconstitutional, or that he subjectively believed that racial discrimination in promotions was constitutional. Mr. Greeson is not entitled to qualified immunity.

**Conclusion**

The defendants' motion for summary judgment is **DENIED.**

Date: 09/29/2011

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Katie J. Kawiecki
City of Indianapolis, Office of Corporation Counsel
kkawiecki@indy.gov

Jeffrey S. McQuary
Brown Tomkins Lory
jmcquary@brown-tompkins-lory.com

Justin F. Roebel
City of Indianapolis, Office of Corporation Counsel
jroebel@indygov.org